# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **BARBARA BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:09-cv-150** |
| | ) | |
| **CITY OF FORT WAYNE, TERESA SMITH,** | ) | |
| **THOMAS L. STRAUSBORGER,** | ) | |
| **DARRIN STRAYER, JEAN GIGLI,** | ) | |
| **BRIAN MARTIN, KIMBERLY SEISS,** | ) | |
| **DARRICK ENGELMAN, and** | ) | |
| **MIGUEL G. RIVERA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION and ORDER

### I. INTRODUCTION

Barbara Brown is suing the individual Defendants, all police officers for the City of Fort Wayne, under 42 U.S.C. § 1983, claiming they were needlessly destructive when they executed a search warrant at a house she owns and then took items not authorized under the warrant. She also alleges that she was arrested without probable cause for maintaining a common nuisance, a class D felony under Indiana law, which in turn led to an unlawful search of her vehicle and purse. Finally, she argues that in the course of the search of the house and her car, some valuable personal property was taken and not returned. The City of Fort Wayne, the officers' employer, is sued for false arrest under *respondeat superior*.

Brown's claims have spawned a series of motions: (1) a motion for summary judgment filed by the City of Fort Wayne and Officers Teresa Smith, Thomas L. Strausborger, Darrin

Strayer,[1] Jean Gigli, Brian Martin, Kimberly Seiss, Darrick Engelman, and Miguel G. Rivera (collectively, "Defendants") (Docket # 18); (2) a cross-motion for summary judgment filed by Brown (Docket # 25); and (3) a supplemental motion for summary judgment filed by Defendants (Docket # 42). Also pending is a motion to strike Brown's Supplement to Interrogatory Number 18, seeking to squelch a purported effort by Brown to resurrect an official capacity claim against the City of Fort Wayne. (Docket # 28.) Brown, however, has since abandoned that claim (Mem. in Supp. of Pl.'s Cross Mot. for Partial Summ. J. ("Pl.'s Resp. Br.") 26), and thus the motion to strike is MOOT.

In sum, the Defendants maintain that all of Brown's claims fail as a matter of law. Brown responds, however, that she is entitled to summary judgment because at least Strausborger and Engelman are liable for the stop of her vehicle and her arrest, and Engelman is liable for the subsequent search of her vehicle and purse.

Ultimately, Defendants' summary judgment motion and supplemental motion (Docket # 18, 42) will be GRANTED in part and DENIED in part. Brown's cross-motion for summary judgment (Docket # 25) will be DENIED.

## II. FACTUAL BACKGROUND

Brown owns a house located at 2611 South Lafayette Street ("the house") which she operates as a homeless shelter under the not-for-profit business title of "The Elija Task, Inc."[2] (Brown Dep. 6, 11). Homeless people would presumably come and go, and even Brown's son,

---

[1] Brown concedes that Strayer was not personally involved in the events giving rise to her claims and should be dismissed from this suit. Accordingly, summary judgment will be GRANTED in his favor.

[2] Brown is the sole shareholder of the not-for-profit corporation, and the corporation has a listed address of 2611 South Lafayette Street. (Brown Dep. 6.) Because the parties assume that Brown is the real party in interest, the Court will do so as well.

Harvey Fields, Jr., was a resident there in December 2007. (Brown Dep. 9.) Fields's status as a house resident, however, was relatively abbreviated, as by January 2008 Brown had evicted him and only Brown's fiancee, William Trigg, lived there. (Brown Dep. 19; Trigg Dep. 6.)

On January 10, 2008, Detective Teresa Smith investigated an undercover drug deal at a residence on Selkirk Drive in which a confidential informant purchased 7.9 grams of crack cocaine from a person who identified Fields as his supplier. (Smith Aff. ¶ 1.) While the confidential informant was inside, Detective Brian Martin saw a sport utility vehicle ("SUV") turn into the driveway and then watched its driver, a black male, enter the residence. (Martin Aff. ¶ 2.) A license plate check showed that the vehicle belonged to Fields. (Seiss Aff. ¶ 2.) After the SUV left the Selkirk Drive residence, Martin followed it to 2611 South Lafayette, where Fields was seen entering the house through the back door. (Martin Aff. ¶ 2.) Although Brown had purportedly ejected Fields from the house, she allegedly did not know that Trigg had given him a key. (Trigg Dep. 12-13.)

Nine days later, on January 19, 2008, Fields was arrested in the same SUV. (Rivera Aff. ¶ 2; Smith Aff. Ex. B.) The vehicle contained a handgun and approximately 43.5 grams of crack cocaine. (Rivera Aff. ¶ 2; Smith Aff. Ex. B.)

Sometime later, but before January 23, 2008, Rivera claims he heard a conversation between Fields, who by then was in the Allen County Jail, and Brown, discussing the removal of some narcotics and digital scales from the house. (Rivera Aff. ¶ 3.) Brown denies any such conversation took place, and there is no mention of it in Smith's Search Warrant Affidavit

presented to the state court judge on January 22, 2008.[3] (Smith Aff. ¶ 4, Ex. B.)

Smith's Search Warrant Affidavit does not mention Brown, and does not specifically allege that any drugs or drug activity were seen at the house. (Smith Aff. Ex. B.) The Affidavit does mention Fields, however, and notes that the SUV's registration lists 2611 South Lafayette Street as his residence. (Smith Aff. Ex. B.) The Affidavit also recites that after the Selkirk Drive deal, Fields drove to the house and entered through the back door. (Smith Aff. Ex. B.) Smith's Affidavit concludes that based on her experience as a narcotics detective, the activities she observed were consistent with drug trafficking. (Smith Aff. Ex. B.) Based on the Affidavit, a Search Warrant issued on January 22, 2008, authorizing a search of the house and the seizure of:

> Cocaine and or any derivatives thereof, United States Currency, firearms, and/or weapons, safes and/or lockboxes, items or records associating individuals with this particular residence, records of drug transactions and/or other financial information, and any United States currency used to purchase controlled substances by the Fort Wayne Police Department prior to the execution of this warrant, which constitutes evidence of alleged drug transactions and illegal possession of said controlled substances.

(Smith Aff. ¶ 5, Ex. C.)

The next morning, January 23, 2008, Smith, Strausborger, Gigli, Martin, Seiss, and Engelman executed the search warrant while no one was at the house. (Smith Aff. ¶ 6; Strausborger Aff. ¶ 2; Martin Aff. ¶ 4; Engelman Aff. ¶ 2; Gigli Aff. ¶ 3; Seiss Aff. ¶ 3.) At that time, Brown was at a credit union withdrawing money for roof repairs to the house, as well as for attorney fees for Fields. (Brown Dep. 19; Brown Aff. ¶¶ 6, 17.) Trigg called her there to

---

[3] Rivera does not say in his Affidavit how he was able to hear the conversation, and Brown claims that she never visited Fields in the jail during this period and did not talk to him (either in person or by telephone) concerning scales, drugs, or drug paraphernalia at the house. (Brown Aff. ¶ 23.) Apparently, no audio tape of the purported conversation exists. (Pl.'s Resp. Br. 7.)

report the presence of officers at the house. (Brown Dep. 19; Brown Aff. ¶¶ 6, 17.)  Brown drove to the house and found the alley blocked by unmarked police vehicles. (Brown Dep. 22.)

Brown went into the house and identified herself as the owner, but no one asked her about any drug activities. (Brown Dep. 23-24; Brown Aff. ¶¶ 7, 25; Smith Aff. ¶ 8; Engelman Aff. ¶ 3.)  Brown observed a large man (apparently Rivera) actively involved in the search.[4] (Brown Aff. ¶ 7; Brown Dep. 26-27.)  Apparently Rivera asked who lived at the house, and Brown told him that only Trigg lived there. (Brown Aff. ¶ 25.)  Brown also observed officers with masked faces "turning things [such as a sofa] upside down," one officer "going through [her] cupboards", and other "things moving." (Brown Dep. 26-27; Brown Aff. ¶ 7, Ex. 5; Pl.'s Resp. Br. Ex. 5, Req. for Admis. No. 11.)

Allegedly, Brown's anger boiled over and she asked "what the hell [is] going on" and inquired about the authority for the search. (Brown Aff. ¶ 8.)  In fact, she loudly protested the search, the turning over of her furniture, and the removal of items from the house. (Brown Aff. ¶ 8.)  After learning that she was the owner, Detective Sergeant Strausborger, apparently the supervising officer, read her the Search Warrant and then told her to leave the property.[5] (Brown Dep. 23-24; Strausborger Aff. ¶ 3.)

Brown again protested how the search was being conducted and threatened to call her lawyer. (Brown Aff. ¶¶ 8, 9.)  At this, Strausborger ordered her off the premises. (Brown Aff. ¶¶ 8, 9.)  When Brown protested, Strausborger threatened to arrest her for interfering, to which she

---

[4] Rivera admits he was present but denies that he actively searched the house. (Rivera Aff. ¶ 4.)

[5] While Strausborger maintains that Brown identified herself as the "owner of the residence" (Strausborger Aff. ¶ 2; Smith Aff. ¶ 8), Engelman recalls her stating that the house was "her home." (Engelman Aff. ¶ 3.)  Smith, on the other hand, heard Brown say that she was the "owner of the property." (Smith Aff. ¶ 8.)  On this point, Brown agrees with Smith. (Brown Aff. ¶¶ 7, 25.)

replied, "[S]houldn't you read me my rights?" (Brown Aff. ¶ 9.)  Strausborger complied with Brown's suggestion, but viewed her as uncooperative and argumentative. (Strausborger Aff. ¶ 3.)

Brown contends she left but that Strausborger started yelling at her. (Brown Aff. ¶ 10.) She returned to her car and remained there awhile. (Brown Aff. ¶ 10.)  Strausborger then approached the car and said that if the house was not her residence, he wanted to know where she lived so the officers could go there next to "tear it up." (Brown Aff. ¶ 10.)  Brown closed the car window, which allegedly made Strausborger even angrier. (Brown Aff. ¶ 10.)  It was at this point that Brown observed (and photographed with a cell phone) an officer removing a computer, video games, and her fur coat from the house. (Brown Aff. ¶ 12.)  After trying to re-enter the house, Brown wrote down the license plate numbers of the police cars and then finally drove away. (Brown Aff. ¶ 14; Brown Dep. 30.)

During the search, Smith located in the pocket of a jean jacket in a closet off of the living room area, a large amount of an off-white chunky substance that looked like crack cocaine and later tested as 47.4 grams of the drug. (Smith Aff. ¶ 10.)  In the same closet was a box of Smith & Wesson .40 caliber ammunition. (Smith Aff. ¶ 7.)  Martin located a Sunbeam digital scale in a storage closet. (Martin Aff. ¶ 5.)  Documents belonging to Fields were found throughout the house, including his identification. (Smith Aff. Ex. D; Engelman Aff. ¶ 2.)

Strausborger considered the presence of these items and the fact that Fields, a known drug dealer, may have been trafficking narcotics from the house, and determined that there was

probable cause to arrest Brown for the offense of maintaining a common nuisance.[6] (Strausborger Aff. ¶ 4.)  Strausborger instructed Detective Engelman to pursue and arrest Brown. (Strausborger Aff. ¶ 5; Engelman Aff. ¶ 5.)

Engelman stopped Brown with his lights and sirens and arrested her. (Engelman Aff. ¶ 4; Brown Aff. ¶ 15.)  He handcuffed her and placed her in the back of his squad car. (Engelman Aff. ¶ 4; Brown Aff. ¶ 15.)  Brown contends that Engelman then searched her car without her permission, removing her purse, three cell phones, and approximately $7,400 in cash. (Brown Aff. ¶¶ 16, 18.)  One cell phone was taken from her vehicle, and the remaining cell phones and the money were taken from her purse.[7] (Brown Aff. ¶ 16.)

That same day, Smith filed in the Allen Superior Court an Affidavit for Probable Cause charging Brown with maintaining a common nuisance, a class D felony under Indiana Code § 35-48-4-13(b). (Smith Aff. ¶ 11, Ex. E.)  Brown's initial hearing was held the next day on January 24, 2008, and probable cause was found for her arrest.[8] (Smith Aff. ¶ 11, Ex. E.)

Brown maintains that she knew nothing about any drug activities at the house or of the drugs and digital scale found there. (Brown Aff. ¶ 22.)  Eventually, the charges against Brown were dismissed, and one cell phone and $1,500 in cash were returned to her. (Stein Aff. ¶ 6; Brown Dep. 39-41; Brown Aff. ¶ 18.)  Although the property log indicates that a Dell desktop

---

[6] Strausborger may also have considered Brown's alleged on-the-scene admission that Fields stayed at the house (Smith Aff. Ex. E), but Brown denies making the statement.  And, while he may also have given weight to Rivera's alleged knowledge of Brown and Fields discussing drug paraphernalia in the house, Strausborger makes no mention of it in his Affidavit and perhaps Rivera never mentioned it to him. (Rivera Aff. ¶ 4.)  In any event, Rivera must have told someone because the purported conversation is referenced in Smith's Affidavit for Probable Cause later that day. (Smith Aff. Ex. E.)

[7] Engelman contends that Brown had only one cell phone and $1,500, which he logged into the property room. (Engelman Aff. ¶ 4.)

[8] Brown apparently appeared without counsel at the initial hearing. (Smith Aff. Ex. E at 2.)

computer and monitor and some video games were removed from the house, they have only recently been returned to Brown, purportedly because she had not previously asked for them. (Stein Aff. ¶ 6.) According to Brown, two cell phones, the fur coat, and $6,000 have never been returned, and the cell phone that was returned no longer contained the photos she had taken of the search. (Brown Aff. ¶ 18.)

Brown contends that she returned to the house the morning after the search and observed "torn up" furniture, wall paneling removed, her security alarm system "yanked out of the wall", and drawers and clothing strewn about. (Brown Aff. ¶ 20.) She pinpoints the search as the event where the paneling was removed and the security system damaged, as both were intact when she entered the house the day of the search. (Brown Aff. ¶ 20.)

## III. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between

litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

When cross-motions for summary judgment are filed, courts "look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *M.O. v. Ind. Dept. of Educ.*, No. 2:07-CV-175-TS, 2009 WL 857548, at *3 (N.D. Ind. Mar. 31, 2009) (alteration in original) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *Id.* (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). "It is true that cross-motions for summary judgment do not waive the right to a trial, but this rule does not alter the respective burdens on cross-motions for summary judgment—more particularly here, the responsive burden of a plaintiff who moves for summary judgment and is confronted with a cross-motion for summary judgment. The motions are treated separately." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 (7th Cir. 2008) (citations omitted); *M.O.*, 2009 WL 857548, at *3.

# IV.  ANALYSIS

A distilling of Brown's multiple legal arguments yields the following claims:[9]

1.  Strausborger, Smith, Martin, Seiss, Engelman, Gigli, and Rivera violated both the Fourth and Fifth Amendments of the United States Constitution[10] by conducting a destructive search and by seizing personal property (a computer, video games, and a fur coat) outside the scope of the warrant;[11]

2.  Those same Defendants violated Brown's right to procedural due process under the Fourth and Fourteenth Amendments by taking and failing to return personal property outside the scope of the warrant.  Similarly, Engelman committed a procedural due process violation when he stopped Brown without probable cause or reasonable suspicion and seized (and failed to return) her cell phones and cash;

3.  Strausborger and Engelman (the latter acting on Strausborger's order) violated the

---

[9] Brown does not challenge the lawfulness of the search warrant, and has abandoned her state law trespass and malicious prosecution claims.

[10] The Due Process Clause of the  Fifth Amendment applies only to actions taken under color of federal law, not state law. *Williams v. Jones*, No. 95 C 6263, 1996 WL 420310, at *3 (N.D. Ill., July 25, 1996) (citing *Gonzales v. City of Chicago*, 888 F. Supp. 887, 890 (N.D. Ill. 1995)).  Brown makes no allegation that federal officers were involved, so this claim fails. *Skinner v. Ambrose*, 556 F. Supp. 2d 921, 926 (N.D. Ind. 2008).
    Brown also alleges that she has a "Takings claim".  However, "the Takings Clause [under the Fifth Amendment] does not apply when property is seized, retained, damaged or destroyed during the course of a criminal investigation." *Johnson v. Manitowoc County*, No. 09-C-248, 2010 WL 1905014, at *4 (E.D. Wis. May 11, 2010). "When the government executes a search warrant in the course of investigating a crime, it is acting pursuant to its police powers, and any collateral damage to private property does not implicate the Takings Clause." *Id.* (citing *AmeriSource Corp. v. United States,* 525 F.3d 1149, 1153 (Fed. Cir. 2008) ("Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause.")).  Consequently, to the extent Brown is advancing a Fifth Amendment claim, it fails at the outset.

[11] Brown asserts that Defendants either participated in this violation of the Fourth Amendment or failed to intervene to prevent others from doing so.  Strausborger, the alleged supervisor, would also be liable if he had knowledge of the deprivation and either approved or condoned it. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) (quoting *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997) (internal quotation marks omitted)).

Fourth Amendment and the due process clause of the Fourteenth Amendment, and committed a state tort by arresting Brown without probable cause, making the City of Fort Wayne liable for false arrest under *respondeat superior*;

4. Strausborger's arrest order was in retaliation for Brown exercising her First Amendment rights and constituted a substantive due process violation, and;

5. Engelman violated the Fourth Amendment by stopping Brown's car under *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), and committed another Fourth Amendment violation when he conducted a warrantless search of her car and purse after arresting and placing her in his police car.

The Court turns to a discussion of these claims. In the end, Brown's Fourth Amendment claim arising from the destructive search of her house and the seizure of the fur coat and video games; the Procedural Due Process claim with respect to the fur coat, cell phones, and $6,000; the unlawful arrest claim against Strausborger; the First Amendment retaliatory arrest claim; and Brown's Indiana state law false arrest claim against Strausborger and the City of Fort Wayne remain for trial.

**A. The Fourth Amendment Claim Concerning the House Search**

Brown argues that Strausborger, Smith, Martin, Seiss, Engelman, Gigli, and Rivera exceeded the scope of the search warrant because they were needlessly destructive during the search and took items beyond what the warrant authorized. Defendants respond, however, that they were entitled to broadly interpret a warrant that called for the search of an entire house for evidence of drugs and that the search and seizures were reasonable. They further argue that

because they relied on a valid search warrant, they are entitled to quasi-judicial immunity.[12]

### 1.  The Allegedly Destructive Search

The Supreme Court recognizes that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979).  In doing so, however, "[t]he general touchstone of reasonableness which governs Fourth Amendment analysis . . .  governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted).  Therefore, "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful . . . ." *Id.*

Ultimately, reasonableness is judged by the totality of the circumstances. *Pena-Bosque v. Lalley*, No. 04 C 3760, 2006 WL 250708, at *5 (N.D. Ill., Feb. 2, 2006) (citing *Tennessee v. Garner*, 471 U.S.1, 9 (1985)).  And, "[w]hen assessing whether a constitutional violation has occurred, [t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances." *Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003) (internal quotation marks omitted) (citing *Graham v. Connor*, 490 U.S. 386, 399 (1989)); *see also Wallace by Wallace v. Batavia  Sch. Dist. 101*, 68 F.3d 1010, 1014-15 (7th Cir. 1995) (stating that "all Fourth Amendment reasonableness inquiries must [retain] an objective perspective").  Nevertheless,

---

[12] The Defendants also maintain that the damage to the house actually occurred on January 19, 2008, when someone apparently broke into the house and caused, in Brown's words, "a total mess". (Brown Dep. 62.)  This argument, however, runs counter to Brown's testimony that she saw damage occurring on January 23, 2008, and the destructive aftermath of the search on the 24th.  Moreover, this case is unlike those where the plaintiff offers only general, conclusory observations about the aftermath of a search; Brown's evidence is specific—in effect, a "before-and-after" snapshot, giving rise to the inference that the Defendants are to blame. *Irwin v. City of Lawrenceburg, Ind.,* 693 F. Supp. 2d 846, 852 (S.D. Ind. 2010) (citing *Heft v. Moore*, 351 F.3d 278 (7th Cir. 2003)).  Of course, it is possible, as the Defendants argue, that some of the damage Brown attributes to the actions of the police on January 23, 2008, actually occurred on the 19th.

because it is usually impossible to know what the executing officers will face as they execute a warrant, it is generally left to their discretion to determine how to proceed with the search, subject to the general Fourth Amendment protection "against unreasonable searches and seizures." *Dalia,* 441 U.S. at 257.

Ultimately, the facts surrounding Brown's claim are easy to summarize: some "torn-up furniture," removed wall paneling, and an active alarm system ripped from the wall. The Defendants do not explain why this alleged destruction was necessary, and Strausborger's alleged comment that the officers wanted to go to Brown's home to "tear it up" raises the inference that the excessiveness was intentional and their methods unnecessary. *Ramirez*, 523 U.S. at 71 ("[E]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment.").

Citing *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992), and *Patton v. Przybylski*, 822 F.2d 697, 699 (7th Cir. 1987), the Defendants argue that they were entitled to interpret the warrant as permitting an expansive search. (*See* Defs.' Reply 5.) *Patton* did not involve a search, and is therefore inapplicable here. *Hessel* indeed states that officers do not need to narrowly interpret a warrant. What *Hessel* was describing, however, were the items that may be taken under a warrant, *not* the conduct of a search. Thus, the authority relied upon by Defendants is not persuasive.

Finally, Defendants argue that because they were executing a search warrant, they are entitled to quasi-judicial immunity. In advancing this argument, they offer a lengthy list of cases to support the general proposition that police officers who execute valid court orders are entitled to absolute immunity. The cases cited by the Defendants, however, did not involve the

execution of a search warrant. As in other search cases where this argument has been tried, quasi-judicial immunity is "misplaced" because "an officer's conduct in carrying out a search warrant is always subject to judicial review for unreasonableness." *Buckley v. Rogers*, 1:08-cv-877-TWP-DML, 2010 WL 2731055, at *4 (S.D. Ind. July 7, 2010) (citing *Irwin*, 693 F. Supp. 2d at 854). Accordingly, this defense fails as a matter of law.

Therefore, since a reasonable jury could conclude that the search of the house was excessively and unnecessarily destructive, Brown's Fourth Amendment claim remains for trial.[13]

## 2. <u>The Seizure of the Computer, Computer Games, and the Fur Coat</u>

The Search Warrant for the house called for the seizure of "[c]ocaine and/or any derivatives thereof, United States Currency, firearms, and/or weapons, safes and/or lockboxes, items or records associating individuals with [the house], records of drug transactions and/or other financial information." (Smith Aff. Ex. B.) Brown argues that the seizure of a Dell desktop computer, some computer games, and a fur coat violated the Fourth Amendment because they all fell outside the scope of the warrant.

"Generally, the government needs a warrant to seize property", *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001), and in particular, "effects" such as personal property. *See Pepper v. Vill. of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005). Even with a warrant, however, the government can violate an individual's Fourth Amendment right to be free of unreasonable seizures if "flagrant disregard" is shown for the terms of the warrant such that it is essentially transformed into a forbidden general warrant. *Hessel*, 977 F.2d at 302. In short, "the Fourth

---

[13] Although Brown describes over-turned furniture and general disarray, she does not mention any other property damage. *Heft*, 351 F.3d at 282. Stated another way, the inconvenience of straightening-up the house does not rise to a constitutional magnitude. *See, e.g.*, *Pena-Bosque*, 2006 WL 250708 at *5.

Amendment 'prevents the seizure of one thing under a warrant describing another.'" *Doe v. Groody*, 361 F.3d 232, 243 (3d Cir. 2004) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

On the other hand, "[o]fficers are entitled to rely on a search warrant, 'which means they [are] required to interpret it.'" *Hessel*, 977 F.2d at 302 (quoting *Patton*, 822 F.2d at 699). And, in seizing items, officers are not required to interpret a search warrant narrowly; the rationale behind the principle is that those items unnecessary for proceeding against the owner can always be returned, whereas items not seized are unlikely to be found the next time the police go looking for them." *Id.* (citing *Andresen v. Maryland*, 427 U.S. 463, 479-82 (1976)).

Brown claims that even with the benefit of these elastic principles, the Defendants flagrantly disregarded the terms of the warrant by seizing her computer, video games, and fur coat.

### a. *The Dell Desktop Computer*

The Search Warrant authorizes the search and seizure of records of drug-dealings, financial information, and "items or records associating individuals with [the house] . . . [.]" (Smith Aff. Ex. C.) Although the Search Warrant does not mention computers, Defendants argue that "items or records" could reasonably include a desktop computer.

"The description of items to be seized limits the scope of the search to areas where those items are likely to be discovered." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010) (citing *Platteville Area Apartment Ass'n. v. City of Platteville*, 179 F.3d 574, 579 (7th Cir. 1999)). Here, of course, the police were authorized to search for "items or records" that would, for instance, link Fields to the premises. A desktop computer is both an item and a repository of

records that could do precisely that, as well as a likely device for storing drug records. *See generally Fermaglich v. Indiana*, No. IP-01-1859-T/K, 2004 WL 2750262, at *28 (S.D. Ind. Sept. 29, 2004) (citing *United States v. Sprewell*, 936 F.3d 581 (9th Cir. 1991) (unpublished) (concluding that a computer is a recording device where an officer searching for pay-and-owe sheets in a narcotics investigation could reasonably expect to find information)). Moreover, apart from the warrant, seizure of the computer was permissible under exigent circumstances, as any records contained on the computer could be easily deleted. *See United States v. Pontefract*, No. 08-069, 2008 WL 4511051, at *3 (W.D. La. Aug. 14, 2008), *aff'd and adopted by* 2008 WL 4461850 (W.D. La. Oct. 1, 2008).

Accordingly, because the computer fell within the scope of the warrant, its seizure did not violate Brown's Fourth Amendment rights as a matter of law.

### b. *The Fur Coat and Video Games*

Brown also maintains that the warrant cannot be read to encompass the alleged seizure of her fur coat and video games. Defendants do not say why these items were taken but argue that under a broad interpretation of the warrant, they were allowed to seize them, or alternatively, are entitled to qualified immunity because they reasonably believed their seizure was authorized.[14]

A search warrant is not a blank check authorizing police officers to take whatever they wish. *Hessel*, 977 F. 2d at 302. Here, the warrant authorized the search for, and seizure of, drugs, money, weapons, or items and records that would tie an individual to the house. There is nothing, however, on this record that suggests that either a fur coat or video games fit within

---

[14] It seems undisputed that the Xbox video games were removed from the premises as they appear in the inventory records. (*E.g.*, Stein Aff. ¶ 5.) There is no record that a fur coat was taken, and Defendants presumably dispute that claim.

these categories.  Accordingly, without more, a reasonable jury could conclude that the seizure of these items was in flagrant disregard of the terms of the warrant. *Id.*

**3**. **Qualified Immunity**

The conclusion reached by the Court concerning the seizure of the fur coat and video games does not end the discussion, however, because Defendants maintain they are entitled to qualified immunity. The doctrine of qualified immunity shields from liability police officers who perform discretionary duties and who act in ways they reasonably believe to be lawful. *Chelios v. Heavener*, 520 F.3d 678, 690-91 (7th Cir. 2008).

As the Supreme Court recently reaffirmed in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), two questions are pertinent to the defense of qualified immunity: whether the alleged facts show that the state actor violated a constitutional right, and whether that right was clearly established at the time of the alleged violation. *Id.* at 816 (discussing *Saucier v. Katz*, 533 U.S. 194 (2001)).  As noted earlier, Brown cannot show a constitutional violation concerning the seizure of her computer, and therefore the Defendants are entitled to qualified immunity on that claim.

Nevertheless, Brown can overcome the qualified immunity defense concerning the seizure of the video games and fur coat by showing that the constitutional right was "clearly established at the time of the alleged violation." *Chelios*, 520 F.3d at 690-91 (citing *Saucier*, 533 U.S. at 201).  She can do this by pointing to "'a clearly analogous case establishing a right to be free from the specific conduct at issue' or by demonstrating that the conduct 'was so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Chelios*, 520 F.3d at 690-91 (citing *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th

Cir. 2001)).

In this context, qualified immunity can be overcome if Brown can point to closely analogous cases of Fourth Amendment violations where police officers disregarded the scope of a warrant. *Cvicker v. Meyer*, No. 05-C-0576, 2007 WL 870125, at *23 (E.D. Wis. Mar. 20, 2007). This seems to be the path Brown is following because she refers to *United States v. Tracey*, which stands for the general proposition that search warrants must particularly describe the things to be seized and that nothing should be left to the discretion of the officer executing the warrant. 597 F.3d 140, 146 (3d Cir. 2010) (citing *Marron*, 275 U.S. at 196).

While *Tracey* does not control in this Circuit, it does accurately recount that the law was clearly established, well-before the search here, that police officers cannot seize items falling outside the scope of a valid search warrant. *Id*. Applying that principle here, Defendants are not entitled to qualified immunity unless the fur coat and video games are somehow arguably related to what they were authorized to seize; that is, drugs, cash, "firearms, and/or weapons, safes and/or lockboxes, items or records associating individuals with [the] . . . residence, records of drug transactions and/or other financial information . . . [.]" *See, e.g.*, *Brindley v. Best*, 192 F.3d 525, 533-34 (6th Cir. 1999) (denying qualified immunity where warrant authorized officers to seize business records but they seized jewelry, precious metal, and gems).

On this record, there is a paucity of evidence revealing why these items were targeted for removal, and the basis for their seizure is hardly apparent. Thus, an inference arises that no reasonably competent police officer could have believed the seizure was lawful under the Fourth

Amendment.[15]  As a result, summary judgment cannot be granted on the defense of qualified immunity.

**B. Brown's Procedural Due Process Claims**

Brown argues that the Defendants violated her procedural due process rights under the Fourteenth Amendment when they seized property outside the scope of the search warrant, arrested her without probable cause, and effectively converted personal property taken from her house, car, and purse.  The Court now turns to those claims.

**1. <u>Brown's Arrest and the Seizures of Property</u>**

Brown only argues in a summary fashion that the due process clause of the Fourteenth Amendment applies to arrests, but that theory has been rejected by the Seventh Circuit in favor of an analysis under the Fourth Amendment's "objectively unreasonable" standard. *Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006).  The same result applies to any claim concerning the seizure of Brown's property. *Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003) (stating that the Fourth Amendment addresses the seizure of property; the Fourteenth Amendment due process clause is limited to the subsequent deprivation of that property).[16]

Therefore, to the extent that Brown is alleging that she has a procedural due process claim arising simply from her arrest or the seizure of her property, those claims fail as a matter of law.

---

[15] Rivera is the only Defendant who asserts that he was not involved in the search (a factual point Brown blunts with her own testimony) and the remaining Defendants do not argue that they had no opportunity to intervene to prevent or stop the alleged constitutional violation. *See Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  Since Defendants do not advance these arguments, the Court will not address them here.

[16] Brown cites to *Byrd v Stewart*, 811 F. 2d 554, 555 (11th Cir. 1987) for the proposition that her Fourth Amendment claim is not barred by the *Parratt* doctrine.  As noted, however, Brown has no Fourth Amendment claim concerning the continuing seizure of her property. *Lee*, 330 F.3d at 466.

## 2. <u>The Retention and Failure to Return Property</u>

Brown's procedural due process claim hinges on her contention that as a result of the seizures, she was deprived of the use of the computer, the video games, some cash, and a cell phone for an extended period of time; and that her fur coat, two cell phones, and approximately $6,000 disappeared. Since the argument of the parties on this issue lacks any clear focus, the Court will begin with an overview of the applicable law.

"To establish a denial of due process under the Fourteenth Amendment, [Brown] must show that [s]he was deprived of a constitutionally protected life, liberty, or property interest, and the defendants didn't afford h[er] the process due under the circumstances." *Skinner v. Ambrose*, 556 F. Supp. 2d 921, 926 (N. D. Ind. 2008) (citing *Ingraham v. Wright*, 430 U.S. 651, 672 (1977); *Board of Regents v. Roth*, 408 U.S. 564, 570 (1972)).

To establish such a claim, Brown must show (1) that the offending actions were taken by someone acting under the color of state law; (2) that the conduct deprived her of a constitutionally protected property interest; and (3) the alleged deprivation occurred without due process of law. *Martin v. Ind. State Police*, 537 F. Supp. 2d 974, 988 (S. D. Ind. 2008) (citing *Germano v. Winnebago County*, 403 F.3d 926, 927 (7th Cir. 2005). The first element is not in dispute, so Brown's claim centers on the second and third steps of the inquiry.

In essence, the Defendants argue that Brown was not deprived of a constitutionally protected interest because some of the items were returned when the criminal charges were dropped (*i.e.*, a cell phone and $1500). They also argue that because she did not request the return of the computer or video games until just recently, any deprivation stemmed from Brown's own inaction.

The Defendants then argue that because the missing items (*i.e.*, the fur coat and most of the money) result from, according to Brown, a random and unauthorized deprivation of property, she had an adequate state law tort remedy—she could have sued them for either conversion or theft.

Brown's response is that she is suing the individual Defendants (she did not bring an official capacity claim, nor does she allege that the City is liable on a theory of *respondeat superior*) because the purported state law remedy was meaningless given the immunity afforded to the Defendants under the Indiana Tort Claims Act ("ITCA"). *See* Ind. Code § 34-13-3 *et seq.*[17]

### a. *The Cell Phone and $1500 cash*

Brown argues that someone, presumably Engelman, took her Sprint cell phone and cash, but in order to establish liability under § 1983, Brown must show that Engelman was personally responsible for the deprivation of her property without due process. *Campbell v Chappelow*, 95 F. 3d 576, 579 (7th Cir. 1996) (citing *Gentry v. Duckworth*, 65 F. 3d 555, 561 (7th Cir. 1995)). Consequently, although there is perhaps an inference that Engelman seized those items, there is also a convincing trail showing that the Sprint cell phone and $1500 in currency were immediately turned in as evidence. (Smith Aff. Ex. A.)

The legal import of this factual conclusion is that once those items were seized by the police, either as a result of an arrest, search warrant, or warrant-less arrest, and a case filed, they instantly fell under the control of the Allen Superior Court and thus were required to be held by the Fort Wayne Police Department. Ind. Code § 35-33-5-5(a). Consequently, if the items were

---

[17] Brown does not argue that her deprivation resulted from the procedures the State of Indiana has established for the return of seized property.

not returned, it was because the Allen Superior Court did not order that disposition, and not due to the personal involvement of Engelman or any of the Defendants. Summary judgment must therefore be granted concerning Brown's claims concerning these items.

**b. *The Computer and video games***

The Court has already determined that as a matter of law the initial seizure of the computer was lawful under the Fourth Amendment. Here, however, Brown maintains that whether seized lawfully or not, these items were not returned until long after her criminal case was over and that the Defendants should be liable under a due process theory for that deprivation. Of course, as noted earlier, to the extent the Allen Superior Court had control of these items, at least until Brown's case was concluded, she has no procedural due process case against Engelman or any of the Defendants.

Furthermore, once the criminal case is over, it is up to the law enforcement agency, and not any of these Defendants, to give notice to the rightful owner that she should take possession of the property. Ind. Code § 35-33-5-4(c). It is unclear whether the law enforcement agency here gave that notice to Brown, but she does not suggest that she made a demand for the items and was rebuffed. In any event, Brown has not shown that the deprivation of this property was due to the personal involvement of any of the Defendants after they turned the items over as evidence. *Campbell,* 95 F. 3d at 579. Therefore, summary judgment must be granted in favor of the Defendants concerning these items as well.

**c. *The Fur Coat, Cell Phones and $6,000***

The remaining items prompt a more traditional analysis. The Defendants recognize that according to Brown's version of the facts, she was permanently deprived of a fur coat, two cell

phones and $6000 in United States currency as they were never turned in as evidence and are now missing.

Brown's claim is still hampered, of course, by an inability to show who is responsible for the unauthorized taking of these items. Because, however, the latter two items were ostensibly last seen in Engelman's possession, a reasonable inference arises, perhaps, that he is the one who converted them.

Regardless of who allegedly converted the items, the Defendants argue that these random and unauthorized deprivations trigger an analysis under *Parratt v. Taylor*, 451 U.S. 527 (1981) *overruled in part*, *Daniels v. Williams*, 474 U.S. 327 (1986) and *Hudson v. Palmer*, 468 U.S. 517 (1984) (holding that intentional deprivation of property does not violate due process so long as adequate state post-deprivation remedies are available). *See also Guenther v. Holmgreen*, 738 F.2d 879, 882 (7th Cir. 1984), cert. denied, 469 U.S. 1212 (1985) (discussing and applying *Parratt's* teaching that "a victim of a property or liberty deprivation who has recourse to an adequate state remedy has not been denied due process of law").

Under *Parratt*, where the conduct of state actors is random and unauthorized and the state is unable to predict or prevent the deprivation, a post-deprivation remedy is all the process that a state must provide. *See, e.g.*, *Schertz v. Waupaca County*, 683 F.Supp. 1551, 1576 (E.D. Wis. 1988) (finding no due process violation for the damage done during a search because there were adequate post-deprivation remedies-a tort remedy and procedures for return of seized property).

On that score, the Defendants argue that Brown could have sued for conversion or theft, and that this is a sufficient remedy under the ITCA. *See Higgason v. Morton,* 171 Fed. Appx.

23

509 (7th Cir. 2006) (unpublished) (guards who disposed of inmate's property not liable for due process violation because plaintiff had adequate due process remedy); *Gable v. City of Chi.*, 296 F.3d 531, 540 (7th Cir. 2002) (Illinois law would have provided post-deprivation remedies—plaintiffs could have brought bailment or replevin actions); *Wynn v. Southward,* 251 F.3d 588, 592-93 (7th Cir. 2001 )(per curiam) (deliberately misplacing a prisoner's dentures and heart medication does not allege a due process violation because plaintiff has adequate post-deprivation remedy in the ITCA and no more process was due); *Wilson v. Civil Town of Clayton*, 839 F.2d 375, 383 (7th Cir. 1988) (same); *Hossman v. Spradlin*, 812 F.2d 1019, 1023 (7th Cir. 1987); *Reed v. Hanlon,* No. 1: 06-cv-1761-SEB-JMS, 2008 WL 696981 at *4, n. 3 (S.D. Ind. Mar. 13, 2008); *Thurman v. Rose*, 575 F.Supp. 1488 (N.D. Ind.1983).  Therefore, as the Defendants see it, Brown had an adequate state law remedy, was not deprived of procedural due process, and has no such claim as a matter of law.

Against this array of case-law authorities, Brown cites *Belcher v. Norton*, 497 F.3d 742, 751-53 (7th Cir. 2007) and essentially argues that her post-deprivation remedies were "meaningless or nonexistent," *see Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996), because the police officers were acting within the scope of their employment and enforcing the law and thus immune under the ITCA. *See* Ind. Code § 34-13-3-3(8).  As that statute provides:

> A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

Ind.Code § 34-13-3-3(8).

The concept of enforcing a law is limited, however, "to those activities in which a government entity or its employees compel or attempt to compel the obedience of another to

laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *Belcher*, 497 F.

3d at 752 (quoting *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 283 (Ind. 1994)).

Consequently, as explained by the Indiana Supreme Court:

"[A]ctivity included within the term 'enforcement of a law' [is] limited to activity attendant to effecting the arrest of those who may have broken the law, and [is] not as broad as a law enforcement officer's employment obligations or requirements made on him by statute. Thus, unless the injuries for which a plaintiff seeks recovery arose out of the actual attempts to effect an arrest of one who may have broken the law, there is no immunity to be found in Section 3( [8] )."

*Fermaglich*, 2004 WL 2750262, at *45 (citing *City of Wakarusa v. Holderman*, 582 N.E.2d 802,

803 (Ind. 1991)).

Applying these principles to the alleged removal of Brown's fur coat, it is apparent, at

least to those courts that have considered the point, that the execution of a valid search warrant is

conduct undertaken to enforce the law and that the officers involved are immune from tort

liability under the ITCA. *Shelby Industrial Park, Inc., v. City of Shelbyville*, No. 1:06-cv-1150-

DFH-WTL, 2008 WL 2018185 at *17-18 (S.D. Ind. May 9, 2008); *Mason v. City of

Indianapolis*, No. 1:06-cv-258-RLY-TAB, 2007 WL 2700193 at *10 (S.D. Ind. Sept. 11, 2007);

*Anderson v. Town of Newburgh*, No. 3:03-CV-00099, 2005 WL 941681 at *9 (S.D. Ind. Feb. 28,

2005) (holding that defendants executing a validly-issued search warrant were clearly entitled to

immunity for detaining plaintiffs); *Gordon v. Whitted*, No. 1: 04 CV 155, 2005 WL 1290644 at

*12 (N.D. Ind. May 27, 2005) (finding officers entitled to law enforcement immunity because

executing a search warrant is conduct undertaken to enforce the law); *cf. Fermaglich*, 2004 WL

2750262, at *45 (stating that officers executing search warrants are immune from conversion

claim in their individual capacities as they were acting within the scope of their employment

under Indiana Code § 34-13-3-5(b)).

Moreover, because Engelman was enforcing a law when he arrested Brown, and because the resulting search and seizures were incident to that arrest, he was acting within the scope of his employment, and is clearly immune under Indiana Code § 34-13-3-3(8). *Belcher*, 497 F. 3d at 752 (citing *Mullin*, 639 N.E. 2d at 283). Furthermore, even criminal acts can fall within that provision if they "originated in activities so closely associated with the employment relationship as to fall within its scope." *Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003) (quoting *Stropes v. Heritage House Childrens Ctr. of Shelbyville, Inc*., 547 N.E.2d 244, 247 (Ind. 1989)).

Therefore, if the officers were acting within the scope of their employment, a point Brown maintains and the Defendants ultimately do not dispute, they are immune under the ITCA even if their conduct was tortious or criminal, provided that the purpose of their conduct was to further their employer's business. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1104 (S.D. Ind. 2008) (citing *City of Anderson v. Weatherford*, 714 N.E.2d 181, 186 (Ind. Ct. App. 1999)).

Consequently, because the Defendants are entitled to the broad statutory immunity afforded by the ITCA, it follows that the statute does not provide an adequate state law remedy to Brown concerning the alleged conversion or theft of her fur coat, two cell phones, and $6,000 in cash. *Belcher*, 497 F.3d at 753. Therefore, as to those items, summary judgment in favor of the Defendants on the procedural due process claim must be denied.

## C. Brown's Unlawful Arrest Claim Against Strausborger and Engelman

Brown argues that Engelman, operating on Strausborger's order, violated the Fourth Amendment and the Fourteenth Amendment Due Process clause by arresting her without probable cause for maintaining a common nuisance. She also alleges that the City of Fort Wayne is liable because Strausborger and Engelman were acting within the course and scope of

their employment when they arrested her.

Strausborger and Engelman respond that they did have probable cause to arrest Brown and that because there was a judicial finding of probable cause at her initial appearance, she is precluded from maintaining a false arrest case now. Strausborger and Engelman also assert that even if there was not probable cause, they are entitled to qualified immunity because they each reasonably believed they had probable cause to arrest Brown.[18]

### 1. Probable Cause to Arrest Brown

"Probable cause is an absolute defense to a claim of wrongful arrest asserted under Section 1983 against police officers." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (citing *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007); *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997)). Probable cause to arrest exists "if, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id*. (citing *Wagner*, 493 F.3d at 836 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979))).

Probable cause, therefore, "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *Id*. (citing *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000) (explaining that there must be a "probability or substantial chance of criminal activity on the suspect's part")). "In determining whether an officer had probable cause, the court steps into the shoes of a

---

[18] Brown's false arrest claim is primarily directed against Strausborger and Engelman as the other Defendants do not seem to have been personally involved in her arrest, *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996). Those other Defendants, however, do not seek summary judgment on that basis and the Court will not make the argument for them. *See generally Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986).

reasonable person in the position of the officer." *Id.* (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)).

Consequently, the Court must "evaluate . . . probable cause 'not on the facts as an omniscient observer would perceive them,' but rather 'as they would have appeared to a reasonable person in the position of the arresting officer.'" *Id.* (citing *Mustafa*, 442 F.3d at 547 (quoting *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998))). The probable cause determination must be made by a jury "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Id.* (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) (explaining that "[i]f the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists").

The statute under which Brown was charged provides:

A person who knowingly or intentionally maintains a building, structure, vehicle, or other place that is used one (1) or more times:

(1) by persons to unlawfully use controlled substances; or

(2) for unlawfully:
      (A) manufacturing;
      (B) keeping;
      (C) offering for sale;
      (D) selling;
      (E) delivering; or
      (F) financing the delivery of;
controlled substances, or items of drug paraphernalia . . .

commits maintaining a common nuisance, a Class D felony.

Ind. Code § 35-48-4-13(b).

A person commits the crime of Maintaining a Common Nuisance, a Class D Felony, if they: (1) knowingly or intentionally maintain a building, (2) that was used one or more times by

persons to unlawfully keep controlled substances or items of drug paraphernalia.[19] *Halferty v. State*, 930 N.E.2d 1149, 1151 (Ind. Ct. App. 2010).

Defendants may establish the knowledge element of the crime by showing that Brown had constructive possession of the drugs or other contraband. *Wheeler*, 539 F.3d at 635 (citing *Bradley v. State*, 765 N.E.2d 204, 212 (Ind. Ct. App. 2002)); *see also Jones v. State*, 807 N.E.2d 58, 65 (Ind. Ct. App. 2004). To establish constructive possession, Brown must have had (1) the intent to maintain dominion and control over the drugs, and (2) the capability to maintain dominion and control over the drugs. *Wheeler*, 539 at 635 (citing *Jones*, 807 N.E.2d at 65; *Chandler v. State*, 816 N.E.2d 464, 467-68 (Ind. Ct. App. 2004)). Therefore, intent can be proven by demonstrating knowledge of the presence of the contraband and "can be inferred from either the exclusive dominion and control over the premises containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband." *Id.* (citing *Jones*, 807 N.E.2d at 65); *see also Chandler*, 816 N.E.2d at 468.

Because it is not suggested that Brown had exclusive control of the house (indeed, the whole basis for the search was Fields's access), the focus shifts to the constructive possession indicators that would tend to show that Brown knew of the presence of the contraband. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). "Under Indiana law, . . . when possession is non-exclusive,

---

[19] Despite Defendants' suggestion that there was evidence of manufacturing in the house, there is little to support that assertion. The presence of digital scales and the large amount of crack cocaine are of limited value absent any showing that the controlled substance was produced, prepared, processed, or packaged there. *Cf.* Ind. Code § 35-48-1-18 (defining the manufacture of a controlled substance in relevant part as "the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin . . . and includes any packaging or repackaging of the substance"). Moreover, a drug manufacturing setting is probative and corroborative of knowledge of contraband only to the extent that the person had been around that setting. *Wheeler*, 539 F.3d at 637.

constructive possession may be proved with the assistance of additional circumstances corroborating the defendant's knowledge of the contraband." *Id.* "These additional circumstances include: (1) incriminating statements given by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband in plain view; and (6) location of the contraband in close proximity to items owned by the defendant." *Id.* (citing *Jones*, 807 N.E.2d at 65).

Against this backdrop, Defendants catalog their basis for probable cause: Brown admitted owning a house in which 47.4 grams of crack cocaine and a digital scale were found; she allegedly knew that Fields had been living there (or had access to the premises); and Rivera had just heard Brown discuss with Fields removal of the drugs and the digital scale from the house. In response, Brown maintains that she did not know that Fields was living at or had access to the house, and denies ever talking to Fields in the jail about removing drugs or paraphernalia. Thus, she argues that the only evidence Defendants had was her ownership of the house where drugs were found.

In that regard, the closest Defendants come to any showing of probable cause is something they do not argue—Engelman's claim that when Brown arrived at the house she declared it to be her "home". (*See* Engelman Aff. ¶ 3.) No one else, however, seems to recall Brown using that term.[20] And though Defendants initially argued that Brown knew about the drugs and paraphernalia because Rivera allegedly heard her discuss those items with Fields, after Brown's

---

[20] Although Smith admits that Brown only described herself as the owner of the property (Smith Aff. ¶ 8), her Affidavit for Probable Cause seeking Brown's arrest for maintaining a common nuisance, signed later that day, recites that Defendants "executed a valid search warrant at [Brown's] residence . . . ." If, of course, the house was Brown's residence, the case for her maintaining a common nuisance would be more compelling. *See, e.g., Halferty,* 930 N.E.2d at 1151. In any event, if Brown is to be believed, Strausborger (who ordered her arrest) knew the house was not her residence because he had earlier asked for her home address. (Brown Aff. ¶ 10.)

denial that the conversation ever took place, Defendants now assert they do not need it to support probable cause. (Defs.' Sur-Reply 3.)

Thus, viewed in a light most favorable to Brown, Strausborger is left to argue that he ordered her arrest because they had found drugs and a digital scale in a house owned by her and that her son, "a known drug dealer, may have been trafficking narcotics from the home." (Strausborger Aff. ¶ 4.) Fields's recent presence in the house is undisputed and indeed, a variety of paperwork belonging to him was found throughout the house, although no one apparently logged it into evidence. Brown, however, continues to maintain that she did not know he had been there.

In any event, merely being present "where drugs are located or associati[ng] with persons who possess drugs is not alone sufficient to support a finding of constructive possession." *Wheeler*, 539 F.3d at 636 (citing *Godar v. State*, 643 N.E.2d 12, 15 (Ind. Ct. App. 1994)). This proposition is, however, from Brown's view of the evidence, about all that Strausborger had at the time he ordered her arrest. Missing from the calculus are any incriminating statements, or any indication how often, or how recently, Brown used or visited the house, and whether any of her items were found in close proximity to the drugs.[21] *Id.* In fact, there is no detailed evidence concerning what possessions Brown had in the house, which after all, was purportedly a homeless shelter. Nor does it appear that Strausborger ever switched his focus to Brown. That is, he did not read her any Miranda warnings until she taunted him into doing do, and while she was uncooperative, Strausborger does not claim that her demeanor was suspicious. *Id.* at 638.

Consequently, looking at the evidence in a light most favorable to Brown, there is

---

[21] The drugs were found in a jean jacket in a closet off the living room area. Brown not only denies ownership of the jacket, but there is also no evidence that any items belonging to her were co-located there.

insufficient evidence that Brown was aware of the drugs in the house. Accordingly, the Court cannot say as a matter of law that Strausborger had probable cause to arrest her for maintaining a common nuisance. *Id.* at 637. By the same token, Brown is not entitled to summary judgment in her favor because other disputed factors many have entered into Strausborger's mental calculations, such as Rivera's report (something at least apparently communicated to Smith that same day), which if true would arguably give rise to probable cause for her arrest.[22]

### 2. Collateral Estoppel Does Not Apply

Defendants also argue that Brown's Fourth Amendment claim cannot be re-litigated because it is barred under the doctrine of collateral estoppel, given the probable cause finding made by a Judge of the Allen Superior Court the day after Brown's arrest. The principal underpinning of this doctrine appears in the full faith and credit provision of 28 U.S.C. § 1738, meaning that the Court must look to Indiana's law of collateral estoppel to resolve the issue. *See Best v. City of Portland*, 554 F.3d 698, 701 (7th Cir. 2008) (citing *In re Catt*, 368 F.3d 789, 790-91 (7th Cir. 2004)). Although *Best* stands for the proposition that Indiana's version of collateral estoppel "bars subsequent litigation of an issue necessarily adjudicated in a former suit if the same issue is presented in the subsequent suit," *id.* (citation and internal quotation marks omitted), it also notes that there must be a "final judgment on the merits" in the first suit. *See also Jennings v. State,* 714 N.E.2d 730, 732 (Ind. Ct. App. 1999); *Sweeney v. State*, 704 N.E.2d 86, 94 (Ind. 1998). Stated another way, the defensive use of collateral estoppel focuses upon whether

---

[22] Although the parties squabble over the proper application of the collective knowledge doctrine, it is not dispositive on this record. For example, the knowledge of all the officers working together closely on the investigation may be imputed to the officer—Strausborger—who requests another officer—Engelman—to effectuate an arrest. *United States v. Williams*, — F.3d —, 2010 WL 4157339, at *7 (7th Cir. Oct. 25, 2010). The problem in this instance, however, is that Brown claims that she did not have a talk with Fields about drugs or paraphernalia, thus raising an issue of fact concerning the truthfulness of Rivera's alleged "knowledge."

Brown had a full and fair opportunity to litigate the issue in the first case and whether it would be unfair under the circumstances to permit its use in the second one. *Jennings*, 714 N.E.2d at 732 (citing *Wilcox v. State*, 664 N.E.2d 379, 381 (Ind. Ct. App. 1996)).

The dismissal of the charge, however, denied Brown a "full and fair opportunity to litigate the issue." *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (explaining that collateral estoppel does not apply when a party lacked a "full and fair opportunity" to litigate in the previous case). For example, applying that principle under Illinois law, the Seventh Circuit Court of Appeals has prohibited the use of collateral estoppel against a party who had no chance to appeal a prior criminal court finding. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1022 n.10 (7th Cir. 2006) (compiling cases). These same concepts apply to the probable cause finding that followed Brown's non-adversarial probable cause hearing, during which she did not have counsel present. *Roberts v. Hochstetler,* 592 F. Supp. 703, 710 (N.D. Ind. 1983); *see also Toro v. Gainer*, 370 F. Supp. 2d 736 (N.D. Ill. 2005) (applying Illinois law). Consequently, collateral estoppel does not apply to preclude Brown's claims.[23]

### 3. Qualified Immunity

Although factual issues preclude a finding that probable cause existed for Brown's arrest as a matter of law, Defendants nevertheless maintain that they are entitled to qualified immunity because, in this context, they reasonably believed there was probable cause to arrest Brown. *Wheeler*, 539 F.3d at 639 (citing *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007)). "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Id.* (citing *Hunter v. Bryant*, 502 U.S.

---

[23] As noted earlier, the probable cause finding may have been based, at least in part, on the erroneous assertion in Smith's Affidavit for Probable Cause that the house was Brown's residence.

224, 227 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986))). In short, qualified

immunity will work as a shield if a reasonable officer could have believed Brown's arrest to be

lawful in light of clearly established law and the information Strausborger or Engelman possessed.

*Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 643 (1987)); *Belcher,* 497 F.3d at 749.

Once again, if the facts alleged show that the state actors did not violate a constitutional

right, or if that right was not clearly established at the time of the alleged violation, that is enough

to establish the defense of qualified immunity. *Pearson*, 129 S.Ct. at 815-16. Brown has the

burden of pointing to "a clearly analogous case establishing a right to be free from the specific

conduct at issue" or to show that "the conduct [at issue] is so egregious that no reasonable person

could have believed that it would not violate clearly established rights.'" *Wheeler,* 539 F.3d at 639

(citing *Smith*, 242 F.3d at 742).

Brown seems to argue egregiousness. That is, in viewing the evidence in a light most

favorable to her, a jury question arises because no police officer would have believed, reasonably

although mistakenly, that there was probable cause to arrest her for maintaining a common

nuisance. (Pl.'s Resp. Br. 25.); *see Wheeler*, 539 F.3d at 640; *Saucier*, 533 U.S. at 201; *Biddle v.

Martin*, 992 F.2d 673, 676 (7th Cir. 1993).

a. ***Strausborger is not entitled to summary judgment on the issue of qualified
immunity for Brown's Arrest***

From Brown's perspective, all that Strausborger knew was that the search of Brown's

house had uncovered crack cocaine, some digital scales (a device frequently used in the selling of

crack cocaine), and .40 caliber ammunition; and that Fields (a known drug dealer) had recently

been in the house. Although documents belonging to Fields were seen throughout the house,

giving rise perhaps to some thought that Brown might be dissembling when she said that only

Trigg lived there, it also seems that Strausborger never focused his investigation on her. Indeed, overall, Strausborger's decision to arrest Brown seems rather hasty and contemporaneous with his less-than-pleasant run-in with her and his purported threat to search her real home.

Consequently, viewed in a light most favorable to Brown, there is a dearth of evidence linking her with the contraband and no circumstances that would afford Strausborger with a reasonable, but ultimately mistaken, basis to believe that Brown was maintaining a common nuisance. *Cf. Wheeler*, 539 F.3d at 640. And, as the instigating officer, Strausborger is not insulated from a challenge to his decision to arrest Brown by the fact that he relied on Engelman to actually make the arrest. *Rogers v. Powell*, 120 F.3d 446, 453 (3rd Cir. 1997) (citing *Whiteley v. Warden,* 401 U.S. 560, 568 (1971)).

Of course, as noted earlier, although a more developed factual record may ultimately support Strausborger's decision, he is not entitled to qualified immunity on the present one, and therefore his motion for summary judgment must be denied.

### b. *Engelman is entitled to qualified immunity for Brown's Arrest*

The question of qualified immunity also arises concerning Brown's claim against Engelman who arrested her on Strausborger's orders. As the Third Circuit Court of Appeals summarized the law in *Rogers v. Powell*:

> The legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who *issued* the statements possessed the requisite basis to seize the suspect. Moreover, an officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis.

120 F.3d at 453 (emphasis in original; internal citations omitted) (citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)). Consequently, Strausborger's command (if issued without probable cause) is insufficient, standing alone, to cloak Engelman with the needed probable cause. *Id.*

On the other hand, Brown faces the general rule that "[t]he police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency." *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (quoting *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998)). Ordinarily then, an "arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Id.* (quoting *Tangwall*, 135 F.3d at 517); *see also Williams*, 2010 WL 4157339, at *7.

If that were the end of the analysis, Engelman would still not be entitled to qualified immunity because of the significant question, discussed earlier, concerning whether Strausborger had probable cause to arrest Brown. But Brown's problem in this instance is the corollary that, "where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." *Duran v. Sirgedas*, 240 Fed. Appx. 104, 115 (7th Cir. 2007) (unpublished) (quoting *Rogers*, 120 F.3d at 455). Although there are factual disputes about whether a reasonable officer could have believed Brown's arrest to be lawful in light of the information Strausborger possessed, the question here is whether it was objectively reasonable for Engelman to rely on Strausborger's directive as a basis for believing that probable cause existed for her arrest. *Id.*

Turning to that issue, there is no suggestion that Engelman's knowledge was equal to Strausborger's, although it is clear that Engelman was aware of some of the unfolding events and presumably thought he heard Brown say that the house was her home. (Engelman Aff. ¶ 3.) He was aware of documents linking Fields to the place and also apparently knew that contraband

36

items had been found there along with some of Brown's personal property. Thus, when Engelman's supervisor ordered Brown's arrest, it was objectively reasonable for him to believe that there was probable cause to do so. *Duran*, 240 Fed. Appx. at 115. Moreover, since Brown had just left in her vehicle, Engelman had no time to reflect or make further inquiries concerning the existence of probable cause if he was expected to apprehend Brown. *Id.*

Accordingly, because it was objectively reasonable for Engelman to believe that probable cause existed for Brown's arrest, he is entitled to qualified immunity as a matter of law.

## D.  Brown Has No Substantive Due Process Claim

Brown maintains that Strausborger committed a substantive due process violation when he instructed Engelman to arrest her. The reach of such a claim is limited, however, and the Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision (here the Fourth Amendment) protects the right allegedly violated. *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (citing *United States v. Lanier*, 520 U.S. 259, 272 (1997); *Albright v. Oliver*, 510 U.S. 266, 273 (1994)); *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). Moreover, Brown's state law claim for false arrest cancels her constitutional tort claim. *Fox*, 600 F. 3d at 840 (citing *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009); *McCullah v. Gadert*, 344 F.3d 655, 658-59 (7th Cir. 2003)).

Consequently, if Brown has a claim, it is for false arrest either under the Fourth Amendment, or Indiana common law, and not under substantive due process.

## E.  Brown's First Amendment Retaliatory Arrest Claim

Brown alleges that her arrest by Engelman at the direction of Strausborger was retaliatory and in violation of her rights under the First Amendment. A First Amendment retaliation claim usually requires a three-step analysis. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S.

274, 285 (1977); *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010).  First, the Court must

decide whether Brown's speech was constitutionally protected.  If so, the Court then examines

whether retaliatory conduct would "deter First Amendment activity in the future," and whether the

speech substantially motivated the retaliation. *Watkins*, 599 F.3d at 6 (quoting *Bridges v. Gilbert*,

557 F.3d 541, 546 (7th Cir. 2009)); *see Spiegla v. Hull*, 371 F.3d 928, 935, 942 (7th Cir. 2004);

*Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003).

　　　If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to

show he would have taken the same action in the absence of the protected speech. *Valentino v.*

*Vill. of S. Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009).  If the defendant carries this

burden, the plaintiff may still reach trial by showing that the defendant's reasons were merely

pretextual. *Valentino*, 575 F.3d at 670; *Morfin*, 349 F.3d at 1005 (applying the Seventh Circuit's

burden-shifting test for employment cases to First Amendment retaliatory arrest claims).[24]

　　　Strausborger argues that Brown was merely voicing private concerns about the lawfulness,

scope, and the manner of the search that the officers were conducting and that this is insufficient to

maintain a First Amendment retaliation claim.  He also maintains that because there was probable

cause to arrest Brown, she cannot establish that her complaints were a substantial or motivating

factor for her arrest.  Finally, he argues that because he had a reasonable belief that there was

probable cause to arrest Brown for maintaining a common nuisance, he is shielded by qualified

immunity from any retaliatory arrest claim.

　　　At the outset, Brown's speech, directed at the police officers and concerning their official

---

[24] After *Gross v. FBL Financial Services., Inc.,* 129 S. Ct. 2343 (2009), Brown must show that her
protected conduct was the but-for reason for her arrest. *See Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009).
At this point, however, Brown needs to merely show causation. *Id.*

conduct, was protected under the First Amendment.[25] *See, e.g.*, *Abrams v. Walker,* 307 F.3d 650,

654 (7th Cir. 2002)*; City of Houston v. Hill,* 482 U.S. 451, 462-63 (1987) ("The freedom of

individuals verbally to oppose or challenge police action without thereby risking arrest is one of

the principal characteristics by which we distinguish a free nation from a police state."); *Enlow v.*

*Tishomingo County,* 962 F.2d 501, 503-06 (5th Cir. 1992) (inquiring about warrant and protesting

raid); *Greene v. Barber*, 310 F.3d 889, 892 (6th Cir. 2002) (calling police officer obscene name);

*Provost v. City of Newburgh*, 262 F.3d 146, 151-52 (2d Cir. 2001) (same).

Turning to the next issue, neither the Seventh Circuit Court of Appeals nor the Supreme

Court has answered the question of whether a plaintiff must prove the absence of probable cause to

prevail on a retaliatory arrest claim. *See Abrams*, 307 F.3d at 657 (specifically declining to rule

"that the existence of probable cause is a complete defense to a First Amendment retaliation claim

in the context of an arrest"), *overruled on other grounds by Spiegla*, 371 F.3d at 941-42 (7th Cir.

2004).

Recently, however, in *Hartman v. Moore*, 547 U.S. 250 (2006), the Supreme Court held

that a plaintiff alleging retaliatory prosecution must plead and prove the absence of probable cause.

District Courts in the Seventh Circuit have reached different conclusions as to what effect

*Hartman* should have on whether probable cause bars suits for retaliatory arrest. *See Trepanier v.*

*City of Blue Island*, No. 03-C-7433, 2008 WL 4442623, at *6-7 (N.D. Ill. Sept. 29, 2008) (holding

probable cause bars First Amendment retaliatory arrest claim); *Baldauf v. Davidson*, No. 1:04-cv-

---

[25] The cases cited by Defendants largely arise in the public employment setting and thus are distinguishable.  The one case involving an arrest, *Larsen v. Fort Wayne Police Dep't*, 1:09-CV-55, 2010 WL 2400374, at *13 (N.D. Ind. June 11, 2010), did not involve a protest directed toward police officers or their actions, but rather, concerned a school patron's strenuous objections about a school policy affecting him and his daughter, thus implicating the *ConnickPickering* public concern line of cases. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 571-72 (1968); *Connick v. Myers*, 461 U.S. 137, 147-48 (1983).

1571-JDT-TAB, 2007 WL 2156065, at *4 (S.D. Ind. July 24, 2007) (same); *Webb v. City of Joliet*, No. 03 C 4436, 2006 WL 3692405, at *4 (N.D. Ill. Dec. 11, 2006) (same); *Gullick v. Ott*, 517 F. Supp. 2d 1063, 1071-72 (W.D. Wis. 2007) (discussing *Hartman* and holding that probable cause does not bar First Amendment retaliatory arrest claim).

Here, the Court has already determined that Strausborger is not entitled to a finding that, as a matter of law, there was probable cause to arrest Brown for maintaining a common nuisance. Thus, *Hartman* would appear to offer no obstacle to Brown's claim. Nonetheless, Defendants argue that because Strausborger had a reasonable belief that he had probable cause to arrest Brown for maintaining a common nuisance, he is shielded by qualified immunity from a retaliatory arrest claim. But as concluded earlier, that too is something the Court cannot resolve in Strausborger's favor as a matter of law.

Strausborger then tries a more nuanced approach by citing *Redd v. City of Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998) (declaring that when an officer has probable cause to arrest someone, or qualified immunity in the sense of "arguable probable cause," he is immune from First Amendment claims arising from that arrest). Similarly, the Second, Fifth, and Eighth Circuits have all dismissed claims for retaliatory arrest where the defendant police officer established "arguable probable cause." *See Benigni v. Smith*, 121 Fed. Appx. 164, 165-66 (8th Cir. 2005) (dismissing retaliation claim where officer had "arguable probable cause" for arrest); *Keenan v. Tejeda*, 290 F.3d 252, 261-62 (5th Cir. 2002) (suggesting that officers would be exonerated from retaliation claim if probable cause existed for arrest); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (dismissing suit "if the officer either had probable cause or . . . [had] an objectively reasonable belief that he had probable cause").

As Strausborger sees it, because he had an objectively reasonable belief that there was

probable cause to arrest Brown, there is no need to inquire into such things as his motives, the lack of probable cause, the nearly contemporaneous speech and arrest, or his comments and demeanor. *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2nd Cir. 2001) (citing *Singer*, 63 F.3d at 120). The point, however, is that these factors lead to at least an inference that the only reason Brown was arrested was because she protested the search and the manner in which it was being conducted. Accordingly, in contrast to cases such as *Baldauf v. Davidson*, No. 1: 04-cv-1571-JDT-TAB, 2007 WL 1202911, at *4 (S.D. Ind. Apr. 23, 2007), where the plaintiff's evidence failed to give rise to an inference that the police officer's belief that he had probable cause was unreasonable (causing retaliation to fail at the causational level), that lack of evidence does not exist here.

Therefore, since an issue of fact exists concerning whether Strausborger had a reasonable belief that he had probable cause to arrest Brown such that he would have arrested her anyway—that is, apart from what she said at the house—this issue remains for trial.

### F. Brown's Claims Surrounding Her Arrest by Engelman

#### 1. <u>The Search of Brown's Car and Purse</u>

Brown maintains that the warrantless search of her car violated the Fourth and Fourteenth Amendments. At the time of the search, January 23, 2008, however, it was well established that when a police officer "has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" including "the contents of any containers found within the passenger compartment." *New York v. Belton,* 453 U.S. 454, 460 (1981). Under *Belton*, the search of such containers as "luggage, boxes, bags, clothing, and the like" is permissible when a lawful custodial arrest has been made. *Id.* at 460 n.4.

And the fact that Brown had been removed from the car just minutes before does not render

the search unlawful. In *Thornton v. United States*, 541 U.S. 615 (2004), the officer arrested the defendant, handcuffed him, and placed him in the back seat of his patrol car. The officer then searched the defendant's car and found a handgun under the driver's seat. *Id.* The Fifth Circuit Court of Appeals found the search to be reasonable under *Belton* because the defendant's car was in his immediate control. *Id.* at 619. The Supreme Court affirmed, holding "[s]o long as an arrestee is the sort of 'recent occupant' of a vehicle such as petitioner was here, officers may search that vehicle incident to arrest." *Id.* at 623-24.

Although the law on this issue recently changed when the United States Supreme Court retreated from *Belton* in the case of *Arizona v. Gant*, 129 S. Ct. 1710, 1723 (2009) (holding that "police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest"), that case was not decided until well over a year after the search at issue here. And, as the Supreme Court specifically noted, "because a broad reading of *Belton* has been widely accepted, the doctrine of qualified immunity will shield officers from liability for searches conducted in reasonable reliance on that understanding." *Gant,* 129 S. Ct. at 1723 n.11.

Although Brown concedes that on January 23, 2008, a lawful arrest would have permitted the type of search Engelman conducted (*see* Pl.'s Resp. Br. 4), she argues that under *Belton* the stop and arrest still had to be lawful and that hers was without probable cause.[26] Given the Court's

---

[26] It appears that Brown is no longer pursuing the notion that the search violated *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Nevertheless, because Engelman pursued and stopped Brown at the direction of Strausborger based on his objectively reasonable belief that probable cause existed for her arrest, he is thus shielded by the doctrine of qualified immunity for that stop.

previous determination that Engelman is entitled to qualified immunity for the arrest, the issue at this point is whether a police officer with a reasonable, but mistaken belief that he had probable cause to arrest Brown, could then proceed to search her vehicle incident to that arrest. Those cases considering the question support Engelman. *See, e.g.*, *Kelly v. Sheriff's Dep't*, 113 Fed. Appx. 582, 584 (5th Cir. 2004); *Jack v. Hansell*, No. 6:08-cv-2069-orl-35KRS, 2010 WL 3517040, at *6 (M.D. Fla. Sept. 7, 2010); *Merring v. Town of Tuxedo, N.Y.*, No. 07 Civ. 10381, 2009 WL 849752, at *11 (S.D.N.Y. Mar. 31, 2009) ("[E]ven if the [i]ndividual [d]efendants somehow did not have probable cause, their belief that they did was objectively reasonable, and thus their decision to search the vehicle was also objectively reasonable and protected by qualified immunity.)

As somewhat of an afterthought, Brown barely mentions, and cites no authority, for the allegation that the warrantless seizure of the items from her purse and car (*i.e.*, three cell phones and a large amount of cash) were without probable cause. Engelman's seizure of multiple cell phones from a person who allegedly had been operating a drug house, and who could easily erase from those phones some important contents, did not violate the Fourth Amendment. *Brady v. Gonzalez,* No. 08 C 5916, 2009 WL 1952774 at *3 (N.D. Ill. July 2, 2009) (collecting cases).

The cash was also subject to seizure. At the time of the arrest, the officers were investigating drug deals involving Fields where pre-recorded buy money was used (Smith Aff. Ex. A) and it would therefore be probative if some of that money was found in Brown's possession. Consequently, Engelman would have had probable cause under the Fourth Amendment to seize, incident to Brown's arrest, the large amount of cash she was carrying. *See e.g.*, *U.S. v. Green,* No. NA 02-27-CR H/N, 2003 WL 21991617 at *5 (S.D. Ind. Aug. 12, 2003).

As a result, because Engelman is entitled to qualified immunity on Brown's claim concerning the search of her vehicle and the seizure of the cell phones and cash, summary judgment

will be granted in his favor.

**2.  The Search of Brown's Cell Phone**

Defendants also argue that the search of Brown's cell phone was warranted as incident to a valid arrest.

The ancillary issue of the lawfulness of a search of a cell phone incident to a valid arrest is receiving increased attention. *See United States v. Murphy*, 552 F.3d 405 (4th Cir. 2009); *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007); *Brady,* 2009 WL 1952774 at *3; *United States v. Valdez*, No. 06-CR-336, 2008 WL 360548 (E.D. Wis. Feb. 8, 2008); *United States v. Mercado-Nava*, 486 F. Supp. 2d 1271 (D. Kan. 2007); *United States v. Dennis*, No. 07-008-DLB, 2007 WL 3400500 (E.D. Ky. Nov. 13, 2007); Matthew E. Orso, *Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence*, 50 Santa Clara L. Rev. 183, 200 (2010); Adam M. Gershowitz, *The iPhone Meets the Fourth Amendment*, 56 UCLA L. Rev. 27 (2008).

On those limited occasions when the issue has been reached, courts have consistently found warrantless searches of cell phones to fall squarely within the search-incident-to-arrest exception. *See, e.g., Murphy*, 552 F.3d at 412; *Finley*, 477 F.3d at 260; *Brady,* 2009 WL 1952774 at *3; *Valdez*, 2008 WL 360548, at *2-3; *Mercado-Nava*, 486 F. Supp. 2d at 1275-79; *Dennis*, 2007 WL 3400500, at *7-8.

Of course, even if seizing and examining the phone was a Fourth Amendment violation, Engelman would be entitled to qualified immunity since there is no clearly established law supporting the proposition that it would be an unlawful search and seizure. *Brady*, 2009 WL 1952774 at *3.

Another problem for Brown is that she does not know who accessed her cell phone and

allegedly deleted the photographs she took of the search.  Therefore, she cannot show, beyond mere speculation, whether any of the Defendants were personally involved in the alleged deprivation. *See Starzenski,* 87 F.3d at 879; *Rascon*, 803 F.2d at 273.

And to the extent she is pointing a speculative finger at Engelman, a reasonable police officer would have believed that he could access the cell phone at the arrest scene in accordance with the Fourth Amendment and existing case law.  Therefore, he is entitled to qualified immunity, *id*., and this part of Brown's case fails as a matter of law.

## G.  Brown's State Law False Arrest Claim

The doctrine of qualified immunity only applies to Brown's false arrest claim under 42 U.S.C. § 1983 and does not shield Strausborger or Engelman from her common law false arrest claim. *Magdziak v. Byrd,* 96 F.3d 1045, 1048 (7th Cir. 1996); *Benning v. Bd. of Regents of Regency Universities*, 928 F.2d 775, 778-79 (7th Cir. 1991).  As such, Brown's common law false arrest claim must be analyzed under Indiana state law.

To succeed on her claim, Brown must establish the absence of probable cause for the arrest. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1104 (S.D. Ind. 2008) (citing *Garrett v. City of Bloomington*, 478 N.E.2d 89, 93 (Ind. Ct. App. 1985)); *Row v. Holt*, 864 N.E.2d 1011, 1016 (Ind. 2007) (citing *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003)).  Probable cause for an arrest exists when the facts and circumstances known to the arresting officer would warrant a person of reasonable caution and prudence to believe that the accused has committed or was committing a crime. *See Gomez v. Adams*, 462 N.E.2d 212, 222 (Ind. Ct. App. 1984); *see also N.J. ex rel. Jackson v. Metro. Sch. Dist. of Washington Twp*., 879 N.E.2d 1192, 1195 (Ind. Ct. App. 2008).

Moreover, a party bringing a claim of false arrest in Indiana must demonstrate that an

officer did not act in good faith when he made an arrest, a standard less stringent than probable cause. *McConnell*, 573 F. Supp. 2d at 1104 (citing *Garrett*, 478 N.E.2d at 94-95). In other words, the party must demonstrate that an arrest is "made in bad faith or with an unreasonable belief in the constitutionality of [the officer's] actions." *Id.* Consequently, a police officer cannot be held liable for false arrest if "the officer believed in good faith that the arrest was made with probable cause and that such belief was reasonable." *Garrett*, 478 N.E.2d at 93 (citing *Brubaker v. King*, 505 F.2d 535, 536-37 (7th Cir. 1974)). "The probable cause determination must be made by a jury 'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Chelios*, 520 F.3d at 686 (quoting *Maxwell*, 998 F.2d at 434); *see also Duvall v. Kroger Co.*, 549 N.E.2d 403, 405-06 (Ind. Ct. App. 1990) ("Probable cause is normally an issue for the jury's determination. However, if the facts are undisputed, probable cause is for the court to determine as a matter of law." (citation omitted)).

As Strausborger and Engelman recognize, Indiana law parallels federal law for false arrest claims. *Risner v. City of Crown Point*, No. 2:08 CV 100, 2010 WL 3782210, at *12 (N.D. Ind. Sept. 21, 2010) (citing *Garrett*, 478 N.E.2d 89). Summary judgment is appropriate where the record as a whole reflects the existence of probable cause. *Id.* (citing *Conwell v. Beatty*, 667 N.E.2d 768, 775 (Ind. Ct. App. 1996)). Accordingly, since there remains an issue of material fact concerning whether Strausborger had probable cause to order Brown's arrest, that issue remains for a jury to decide.

Concerning Engelman, however, Brown has failed to show that he did not act in good faith in reasonably believing that probable cause existed to arrest her when he did so at the direction of Strausborger. *Garrett,* 478 N.E.2d at 94. Moreover, to the extent Brown is maintaining that the stop of her vehicle was an arrest, that claim fails because an investigatory stop does not constitute

an arrest under Indiana's definition of arrest. *Elliott v. Sheriff of Rush County, Ind.*, 686 F. Supp. 2d 840, 867 (S.D. Ind. 2010) (citing *James v. State*, 622 N.E.2d 1303, 1307 (Ind. Ct. App. 1993). Accordingly, Engelman is entitled to summary judgment on Brown's false arrest claim.

Strausborger is also not entitled to immunity under the ITCA from Brown's state law false arrest claim. To explain, the law enforcement immunity section of the ITCA, Ind. Code § 34-13-3-3, provides that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." (emphasis added); *see also Row*, 864 N.E.2d at 1016 n.4 (noting that the ITCA does not extend to the torts of false arrest and false imprisonment). Therefore, the ITCA does not immunize Strausborger from the state law claim of false arrest.

Finally, "[u]nder the doctrine of respondeat superior, an employer is liable for the acts of its employees which were committed within the course and scope of their employment." *City of Fort Wayne v. Moore*, 706 N.E.2d 604, 607 (Ind. Ct. App. 1999). Because there is a genuine issue of material fact concerning whether Strausborger had probable cause to order Brown's arrest, and to the extent he was acting within the scope of his employment when he did so, the state law tort claim against the City under respondeat superior survives.

## V. CONCLUSION

To summarize, the Defendants' summary judgment motion and supplemental motion (Docket # 18, 42) are GRANTED as to all claims except for the following, to which they are DENIED: Brown's Fourth Amendment claim arising from the destructive search of her house and the seizure of the fur coat and video games; the Procedural Due Process claim with respect to the fur coat, cell phones, and $6,000; the unlawful arrest claim against Strausborger; the First

Amendment retaliatory arrest claim; and Brown's Indiana state law false arrest claim against Strausborger and the City of Fort Wayne. Brown's cross-motion for summary judgment (Docket # 25) is hereby DENIED. The Defendants' Motion to Strike (Docket # 28) is MOOT. Summary judgment is GRANTED in favor of Defendant Darrin Strayer on all claims.

This matter is set for a final pretrial conference for December 14, 2010, at 1:00 p.m. Counsel are to confer to consider narrowing the issues and parties in their proposed pretrial order.

SO ORDERED

November 4, 2010.

S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge